**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1709**

———————

ANTHONY DEFEO; CHEON JONG KU; NG YU,

        Plaintiffs – Appellants,

    and

MICHAEL LEACOCK, individually and on behalf of all others similarly situated,

        Plaintiff,

    v.

IONQ, INC.; PETER CHAPMAN; THOMAS KRAMER; NICCOLO DE MASI;
HARRY YOU; DARLA ANDERSON; FRANCESCA LUTHI; CHARLES WERT,

        Defendants – Appellees.

———————

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Deborah Lynn Boardman, District Judge.  (8:22-cv-01306-DLB)

———————

Argued:  January 31, 2025                               Decided:  April 8, 2025

———————

Before NIEMEYER, AGEE and THACKER, Circuit Judges.

———————

Affirmed by published opinion.  Judge Agee wrote the opinion in which Judge Niemeyer
and Judge Thacker joined.

———————

**ARGUED:**  Brian Peter Calandra, POMERANTZ LLP, New York, New York, for
Appellants.  Ryan Edward Blair, COOLEY LLP, San Diego, California; Michael S. Hines,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Boston, Massachusetts, for Appellees. **ON BRIEF:** Jordan A. Cafritz, Washington, D.C., Adam M. Apton, LEVI & KORSINSKY, LLP, New York, New York; Jeremy A. Lieberman, POMERANTZ LLP, New York, New York, for Appellants. Junbo Hao, THE HAO LAW FIRM, Beijing, China, for Appellant Ng Yu. David E. Mills, Caitlin B. Munley, Washington, D.C., Kathleen R. Hartnett, San Francisco, California, Linh K. Nguyen, Allison W. O'Neill, Vivienne A. Pismarov, San Diego, California, Elizabeth M. Wright, COOLEY LLP, Boston, Massachusetts, for Appellees IonQ, Inc.; Peter Chapman; and Thomas Kramer. James R. Carroll, Rene H. DuBois, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Boston, Massachusetts, for Appellees Niccolo de Masi, Harry You, Darla Anderson, Francesca Luthi, and Charles E. Wert.

---

AGEE, Circuit Judge:

IonQ, Inc., a public company that develops quantum computers, saw its share price close at $7.86 on May 2, 2022. Nine days later, its stock closed at $4.34. A group of aggrieved investors (the "Shareholders") claim the drop in stock price and their attendant financial loss was caused by the Scorpion Report (the "Report"), published on May 3. The Report alleged that IonQ and its component companies had been perpetrating a widespread fraud on the market as to the value of the company. When that alleged fraud was revealed, the market reacted, leading to the stock price decline. The Shareholders then filed suit against IonQ claiming various iterations of securities fraud.

This appeal asks whether the Shareholders adequately pleaded loss causation—a necessary element to state each of their security fraud claims—by relying on the Report and IonQ's response to it. Like the district court, we think the answer is no, so we affirm its judgment.

I.

We take the facts from the Shareholders' proposed second amended complaint and accept the well-pleaded ones as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We also necessarily borrow from certain unchallenged papers in the record provided by IonQ that "[Share]holders failed to attach . . . to their complaint" but that are "integral to and explicitly relied on in the complaint." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

That said, the background explanation for this case proceeds in three parts.

3

A.

Two professors founded IonQ in 2015 as a startup dedicated to developing quantum computers. In October 2020, it unveiled a new product: a 32-qubit quantum computing system.[1] IonQ did not make this new system commercially available at the time but touted its revolutionary capabilities to the public. That announcement set a niche corner of technology media abuzz. One outlet, for example, recognized the potential that IonQ's 32-qubit system could lead to the "most powerful quantum computer yet," while also noting that "the quantum computing community" reacted to IonQ's news with "a bit of skepticism." J.A. 996.

dMY Technology Group, Inc. III, a technology-focused special purpose acquisition company formed in 2020, evidently took notice of IonQ's announcement. The month after IonQ revealed its 32-qubit system, dMY approached the company to discuss a potential merger. After dMY conducted extensive due diligence into IonQ, the companies entered a merger agreement on March 7, 2021. Because dMY was a public company, its shareholders were required to vote to approve the merger before it closed. On September 28, 2021—after a campaign encouraging investors to vote to approve the corporate marriage—the

---

[1] As described by the Shareholders, "[q]uantum computers are fundamentally different from 'classical' computers." J.A. 987. They "use the laws of quantum mechanics . . . to represent units of information, and those units of information interact with specially designed hardware and software to solve complex problems." *Id.* The use of quantum mechanics "make quantum computers much more powerful than any, even theoretical, future classical supercomputer." J.A. 974. IonQ's 32-qubit system would purportedly be the most powerful computing system in the world.

merger was approved by overwhelming majority. The newly merged company took the name of IonQ and began trading publicly on October 1, 2021.

B.

On the morning of May 3, 2022, Scorpion Capital LLC published the Report online as a long slide deck reporting its "finding" that IonQ was "[a] scam built on phony statements about nearly all key aspects of the technology and business." J.A. 506. The Report, which its publisher touted as "the most in-depth due diligence to date on IonQ," was based on certain public information and selective interviews of unnamed former IonQ employees, customers, and quantum computing experts. J.A. 508; *see* J.A. 507. As relevant here, the Report made four findings that led to its conclusion that IonQ was running a "quantum Ponzi scheme." J.A. 508.

First, Scorpion Capital said its "research indicate[d] that IonQ's purported 32-qubit 'world's most powerful quantum computer' is a brazen hoax." J.A. 508; *see, e.g.*, J.A. 558 ("Extensive interviews with ex-executives and employees confirm our findings and lead us to conclude that the company's claims of a 32-qubit machine are fraudulent.").

Second, it deemed IonQ's claims about "rapid miniaturization"—i.e., manufacturing their existing systems small enough to be commercially practical—to be "completely outrageous." J.A. 579–80; *see, e.g.*, J.A. 586 (quoting an anonymous ex-employee as calling IonQ's "promotion of server-sized IonQ machines by next year" "just baloney").

Third, it stated that IonQ misled investors about the efficacy of its computers by mischaracterizing "'pernicious' error rates" as indicating strong performance. J.A. 509;

5

*see, e.g.*, J.A. 607 ("Virtually every ex-IonQ employee and expert we interviewed slammed the error rates shown as a joke.").

Fourth, it concluded that "IonQ's revenue and bookings are driven by phony related-party deals" which "creat[ed] the illusion of commercial momentum prior to" its public listing after merging with dMY. J.A. 511; *see* J.A. 651 ("IonQ's revenue is a farce: the two customers that drove 70% of its revenue in [2021] Q3 are the University of Maryland . . . and Duke. . . . The entities are so intertwined it is difficult to discern where they end and IonQ begins. . . . [IonQ is] admitting that its largest customer is itself.").

Notwithstanding the foregoing representations, the Report's opinions came after a long set of prefatory disclosures. The Report reveals that Scorpion Capital, the publisher, is short on IonQ stock, and therefore "stands to realize significant gains in the event that the price of its stock, bonds, options, and/or other securities decline or change."[2] J.A. 507. Then, Scorpion Capital reveals that the nonpublic information in the Report may be

---

[2] At its base, a short-sale is a bet against the value of a company's stock. *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1178 n.3 (9th Cir. 2024). In "[a] typical short sale[,]" an entity "borrows stock from a broker, sells it to a buyer on the open market, and later purchases the same number of shares to return to the broker." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 377 (2016). If "the stock price . . . decline[s] between the time" the entity "sells the borrowed shares and the time [it] buys replacements to pay back [its] loan," "the seller gets to pocket the difference." *Id.*

Scorpion Capital is an activist short selling firm. "Activist short sellers often take a short position on a target company—*i.e.*, they bet that the value of the company's stock will decrease—and then may publish reports reflecting poorly on the target company." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th at 1178 n.3. Put another way, Scorpion Capital's raison d'être is to drive a public company's share price down so that it can profit.

inaccurate. Though its "opinions are held in good faith, and . . . based . . . on the public

information, sources, the interviewed individuals, and any social media posts cited in this

report," Scorpion Capital "cannot and does not provide any representations or warranties

with respect to the accuracy of those materials." *Id.* Similarly, while it "believe[s] the

experts [it] spoke with are reliable sources of information with respect to IonQ," Scorpion

Capital could not authenticate their accuracy. *Id.* And finally, Scorpion Capital divulges

that the quotes that appear in the Report may not be credible:

> The quotations of experts used in this article do not reflect all information
> they have shared with us, including, without limitation, certain positive
> comments and experiences with respect to IonQ. In addition, the experts have
> typically received compensation for their conversations with us and may
> have conflicts of interest or other biases with respect to IonQ, which may
> give them an incentive to provide us with inaccurate, incomplete or otherwise
> prejudiced information. The former employees of IonQ that we spoke with
> are by definition separated from the company and thus the information they
> have provided may be outdated. . . . The quotations of experts used in this
> article are based on Scorpion Capital LLC's conversations with such experts
> and may be paraphrased, truncated, and/or summarized solely at our
> discretion, and do not always represent a precise transcript of those
> conversations.

*Id.*

On May 4, the day after the Report's publication, IonQ addressed it in a short press

release. The company rebuked the Report for its "important inaccuracies and

mischaracterizations regarding IonQ's business and progress to date," and highlighted that

the Report's publisher was short IonQ, and therefore "[stood] to profit in the event that the

stock price of IonQ decline[d]." J.A. 690. IonQ encouraged investors not to trade its stock

based on the Report.

On May 12, IonQ's founders released a longer, sterner statement addressing the Report, and stating it was "a poorly researched 183-page deck intended to manipulate the stock price of IonQ." J.A. 692. The Report, they wrote, was "riddled with disinformation, demonstrating a breathtaking ignorance of the quantum computing industry in general and IonQ technology in particular." J.A. 693.

IonQ's stock price fluctuated during the period after the Report's publication and ultimately declined in price significantly. It closed at $7.86 on May 2. The next day—the day the Report was published—it closed at $7.15. By May 12, IonQ stock value dropped to $4.34 per share at close.

## C.

Soon after the Report's publication, the Shareholders filed a securities class action on behalf of all stockholders investing in IonQ between March 7, 2021—the day the merger was announced—and May 2, 2022—the day before the Report's publication (the "Class Period"). Their first amended complaint brings three claims under the Securities and Exchange Act of 1934. Count 1 asserts violations of § 10(b) and Rule 10b-5 by IonQ and dMY, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5. Count 2 alleges violations of § 14(a) and Rule 14a-9 by IonQ and dMY, 15 U.S.C. § 78n(a), 17 C.F.R. § 240.14a-9(a). Count 3 claims violations of § 20(a) by various named individual defendants who are associated with the entity defendants, 15 U.S.C. § 78t(a).

The amended complaint mirrors the Report. The Shareholders alleged that IonQ failed to disclose four material facts about its business forecast to induce approval of the merger and to inflate its share price throughout the Class Period: (1) it did not actually have

a 32-qubit quantum computing system; (2) the systems it did have were not close to commercial miniaturization; (3) its systems' error rates were worse than it let on; and (4) the threefold increase in contract bookings before the merger vote came from a single transaction with an institutional client. *See* J.A. 974; J.A. 1030–31. Once the Report unveiled the truth behind each of those four facts, the Shareholders' theory goes, IonQ stock plummeted, and the Shareholders consequently suffered financial losses.

On Defendants' motions, the district court dismissed the Shareholders' first amended complaint with prejudice for failure to state a claim under Fed. R. Civ. P. 12(b)(6). To begin, the court found that the Shareholders failed to allege that the Report and confidential witness, on which the first amended complaint relied, were "reliable sources of information." *Leacock v. IonQ, Inc.*, No. 22-cv-1306, 2023 WL 6308045, at *15 (D. Md. Sept. 28, 2023) [hereinafter *IonQ I*]. Without any reliable sources, the Shareholders had "not alleged the elements of a Section 14(a), Section 10(b), or Section 20(a) claim" and therefore failed to state a claim. *Id.* Expanding further on its decision, the district court explained that even if it were to consider the Report and the confidential witness' allegations, the Shareholders' claims would still be dismissed. As to the § 14(a) claim, the court found that the Shareholders failed to adequately plead any "materially false or misleading statements" in the proxy for the merger, *id.* at *20, *21, and "loss causation," *id.* at *24. As to the § 10(b) claim, the court found that the Shareholders "fail[ed] to sufficiently plead the elements of scienter, loss causation, or both." *Id.* And because the Shareholders' § 20(a) claim was derivative of their failed § 14(a) and § 10(b) claims, the court found they failed to state that claim as well. *Id.* at *38–39.

9

The Shareholders did not immediately appeal, opting instead to request post-judgment relief in the district court. They simultaneously moved for reconsideration under Fed. R. Civ. P. 59(e) and for leave to file an amended complaint under Fed. R. Civ. P. 15(a). Their proposed second amended complaint added allegations intending to bolster the parts of their prior complaint that the district court initially found lacked muster, but in all other material respects mirrored the first amended complaint.

The district court rebuffed this attempt at reviving the Shareholders' class action for a single reason: the proposed second amended complaint still failed to plead loss causation, rendering the proposed amendment futile. *Leacock v. IonQ, Inc.*, No. 22-cv-1306, 2024 WL 3360647, at *9 (D. Md. July 10, 2024) [hereinafter *IonQ II*] ("The proposed second amended complaint still fails to state a claim under the three statutes the plaintiffs invoke. Even assuming without deciding that the plaintiffs have plausibly alleged facts sufficient to establish the reliability of the Scorpion Report and [the confidential witness], the plaintiffs have not pled loss causation . . . . Accordingly, amendment would be futile.").

The Shareholders appealed both orders, and we have jurisdiction under 28 U.S.C. § 1291.

## II.

The Shareholders ask us to vacate the district court's order granting IonQ's motion to dismiss "and/or" its order denying their motion for post-judgment relief. *See* Opening Br. 27. It is apropos to clarify the scope of our review at the outset.

This appeal comes to us after the district court denied what was "in effect, . . . a post[-]judgment motion for leave to file" a proposed second amended complaint to cure the deficiencies in the Shareholders' first amended complaint. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 470 (4th Cir. 2011). The court did so after finding amendment would be futile because, like in the first amended complaint, the proposed second amended complaint still failed to plead loss causation. Aside from that crucial defect, we do not know how the district court would have disposed of the Shareholders' post-judgment motion as to other grounds. We therefore limit our review to determining whether the finding of futility for failure to state a claim was erroneous. Under these circumstances, we review that issue de novo. *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021).

"Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards[.]" *Katyle*, 637 F.3d at 471. And to avoid futility, the proposed amended "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (quoting *Ashcroft*, 556 U.S. at 678); *see In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d at 750 (applying Rule 12(b)(6) standards to the futility question).

Security fraud claims brought under §§ 10(b) and 14(a) of the Securities Exchange Act share "loss causation" as a mandatory element for recovery. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (Section 10(b)); *Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 231 (4th Cir. 2023) (Section 14(a)). And because § 20(a) liability is derivative,

a complaint predicating such a claim on a § 10(b) or § 14(a) violation also depends on loss causation. *See San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 246 n.11 (4th Cir. 2023). Thus, as the district court understood, the viability of the Shareholders' case—or more specifically, the futility of their proposed second amended complaint—turns on whether they adequately pleaded loss causation.

All that is to say that this appeal requires us to determine only whether the Shareholders pleaded loss causation in their proposed second amended complaint.

## III.

## A.

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc.*, 544 U.S. at 342. Pleading securities fraud claims in federal court, like most fraud-based causes of action, requires satisfying stricter-than-usual pleading standards. *See Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018). We review loss causation allegations for "sufficient specificity," a standard "largely consonant with Fed. R. Civ. P. 9(b)'s" particularity requirement. *Katyle*, 637 F.3d at 471 (quoting *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 119–20 (4th Cir. 2009)). "Because loss causation is fact-dependent, the specificity sufficient to plead [it] will vary depending on the facts and circumstances of each case." *Id.*

To plead loss causation, a plaintiff must plausibly and with sufficient specificity allege that "(1) the exposure of the defendant's misrepresentation or omission, i.e., the revelation of new facts suggesting the defendant perpetrated a fraud on the market, and (2)

[] such exposure resulted in the decline of the defendant's share price." *Singer*, 883 F.3d at 445 (4th Cir. 2018) (cleaned up); *see also Dura Pharms., Inc.*, 544 U.S. at 343–44. A complaint "satisfies the ultimate loss causation inquiry by alleging losses resulting from 'the relevant truth . . . leak[ing] out' about the" company's alleged fraud. *Singer*, 883 F.3d at 447 (quoting *Dura Pharms.*, 544 U.S. at 342) (alterations in original).

As to exposure, "the first requisite to adequately pleading loss causation" is pointing to the emergence of *new* facts in the market that reveal the truth behind a company's fraud. *Katyle*, 637 F.3d at 473. The requisite exposure "must present facts to the market that are new, that is, publicly revealed for the first time, because 'if investors already know the truth, false statements won't affect the price.'" *Katyle*, 637 F.3d at 473 (quoting *Schleicher v. Wendt*, 618 F.3d 679, 681 (7th Cir. 2010)).

We have recognized three ways of showing such exposure. *Singer*, 883 F.3d at 445, 447. The first is through a "corrective disclosure theory," in which "the defendant company itself made a disclosure that 'publicly revealed for the first time' that the company perpetrated a fraud on the market by way of a material misrepresentation or omission." *Singer*, 883 F.3d at 445 (quoting *Katyle*, 637 F.3d at 473). The second way is through a "materialization of a concealed risk theory," which allows for the possibility that a miscreant company's fraud is exposed by a third party. *Id.* The third is through an "amalgam" of the first two, allowing for the reality that the truth of a company's fraud can leak out slowly from a variety of different sources. *See id.* at 446–47.

Under any of those theories, if a plaintiff fails to plausibly and with sufficient specificity allege that any new truth was exposed to the market, he fails to plead loss

causation. *See Singer*, 883 F.3d at 444–45; *see also Teachers Ret. Sys. v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) ("To allege loss causation in this case, plaintiffs would have to allege that the market reacted to new facts disclosed in June 2003 that revealed Cree's previous representations to have been fraudulent."). Part of our analysis, then, requires asking "whether the market could have perceived [a putative disclosure] as true." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 696 (6th Cir. 2017). Put another way, it is not enough to plead that some allegation of fraud hit the market if it is implausible to believe that said allegation revealed any new truth to the market.

## B.

Here, the Shareholders allege that the market learned of IonQ's fraud through an amalgam of exposures. They identify both the Report and IonQ's May 4 public response—taken individually or together—as revealing to the market that IonQ misrepresented its financial forecast. We address these alleged exposures in turn.

## 1.

The Shareholders' loss causation theory rests mostly on the Report, as they allege that "[t]he [t]ruth [e]merge[d]" when "[t]he Scorpion Report . . . disclosed that [IonQ] did not have a 32 qubit computer, that its existing systems were nowhere near miniaturization, that [it] had misled investors about its system's error rates and error correction, and [it] had misrepresented the source of its purported contract bookings increase." J.A. 1054–55. As did the district court, we find these allegations lacking.

We have not yet had occasion to consider whether a short-seller publication, like the Report, can plausibly expose the truth of a company's fraud as needed to plead loss

causation. The Ninth Circuit has, however, considered this precise circumstance, and concluded that similar publications cannot meet the pleading standard. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022); *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794–95 (9th Cir. 2020). We find the Ninth Circuit's jurisprudence persuasive.

*In re BofI Holding, Inc.* considered whether anonymous blog posts from short sellers that disclaimed their own accuracy could constitute corrective disclosures for purposes of pleading loss causation in a security fraud case. 977 F.3d at 797. The court held they could not, reasoning that "[t]he posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made 'no representation as to the accuracy or completeness of the information set forth in this article.'" *Id.* Because "[a] reasonable investor reading these posts would likely have taken their contents with a healthy grain of salt[,]" the court reasoned it was "not plausible that the market reasonably perceived these posts as revealing the falsity of [the company's] prior misstatements, thereby causing the drops in [its] stock price on the days the posts appeared." *Id.*

It is appropriately a "high bar that plaintiffs must meet in relying on self-interested and anonymous short-sellers" when attempting to plead loss causation. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th at 839. That doesn't mean that a short-seller's report can never support the loss causation element. *Cf. In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th at 1186–87 (crediting an anonymous short-seller report that revealed new, empirical facts to the market to find loss causation adequately pleaded). Rather, when authors of a

15

report are "anonymous and self-interested short-sellers who disavowed any accuracy," their reports are "rendered . . . inadequate" for purposes of pleading loss causation. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th at 840.

Borrowing the Ninth Circuit's language, the Shareholders here fail to clear the high bar of showing that the Report revealed the truth of IonQ's alleged fraud to the market. As in *In re Nektar Therapeutics*, the self-interested Report relies on anonymous sources for its nonpublic information and disclaims its accuracy. 34 F.4th 840. The Report's publisher admits some quotations "may be paraphrased, truncated, and/or summarized solely at our discretion, and do not always represent a precise transcript of those conversations." J.A. 507. That disclosure is particularly troubling because it gives Scorpion Capital the kind of editorial license that could allow it to say just about anything and cloak it in the imprimatur of truth in order to make a buck. For example: If an expert represented, "IonQ's 32-qubit system is revolutionary. By comparison, Company Y's system looks prehistoric," Scorpion Capital gave itself the freedom to say, "IonQ's 32-qubit system looks prehistoric," and attribute that quote to an expert. In all, those disclosures lead to the conclusion that "the character of the" Report "rendered it inadequate" to reveal any alleged truth to the market. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th at 840.

The Shareholders resist this conclusion by arguing that such a holding would prevent defrauded investors from relying on legitimate short-seller reports. But we, like the Ninth Circuit, do not impose a categorical ban on using short-seller reports to plead loss causation. *See e.g.*, *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th at 1186–87. In appropriate circumstances, a short-seller report's financial motivation may not disqualify

it from use in litigation as alleging that it exposed a company's fraud to the market. But when a short seller makes the kinds of disclaimers the Report does here, its potential evidentiary value evaporates. While all short seller reports will likely share the same ulterior profit motivation, not all will rely entirely on anonymous sources for their incendiary claims, disclaim the accuracy of their opinions as well as that of the non-public source material from which it claims those opinions derived, and admit to tailoring quotations to fit the publisher's narrative. We find it implausible these statements accompanied by those kinds of disclosures, published by an activist short seller, would reveal some new truth to the market.

The district court did not stop its loss causation analysis there. In dismissing the first amended complaint, the court explained that it would "not categorically conclude that a plaintiff can never plead this sort of report caused their losses" because "[a]dditional factual allegations might turn the otherwise implausible claim that this sort of short-seller report exposed the truth to investors into a claim plausible enough to survive a motion to dismiss." *IonQ I,* 2023 WL 6308045, at *22. The Shareholders' proposed second amended complaint tries to follow that guidance and bolster their allegation that the Report's publication caused IonQ's drop in stock value by citing to four news articles published after the Report. J.A. 1055–56, n.20–23. As the district court found, they are of no help.

The Shareholders claim "[m]arket watchers uniformly attributed the decline in the IonQ's share price to the . . . Report, particularly its revelation that IonQ's 32-qubit computer did not exist." J.A. 1055. We do not find it plausible to read those articles to support the Shareholders' claim when we consult their actual text. None of the articles

17

credit the Report as revealing any truth about IonQ's purported fraud, but instead observe that the company's stock price fell after Scorpion made inflammatory allegations. *See, e.g.*, Joshua Fineman, *IonQ drops after new short report from Scorpion Capital*, Seeking Alpha (May 3, 2022, 6:03 AM), https://seekingalpha.com/news/3831016-ionq-drops-after-new-short-report-from-scorpion-capital [https://perma.cc/RM98-7KHX] ("IonQ Inc. . . . fell 6.7% after a new short report from Scorpion Capital that alleged the quantum computing company may be a 'hoax.'"). And the most thorough article cited acknowledges the correlation but emphasizes to investors "cautionary areas" about the Report. Alex Challans, *TQI Exclusive: IonQ Stock Falls After Short Report From Scorpion Capital*, Quantum Insider (May 4, 2022), https://thequantuminsider.com/2022/05/04/ionq_short_scorpion/ [https://perma.cc/UF7L-N55H]. While acknowledging that the "scathing short report" "help[ed] drive a 10% decline in the IONQ stock price," Quantum Insider also identified an "egregious" misstatement in the Report and explained that one of the alleged points against IonQ was "not a particularly helpful analysis."

Taken together or separately, the articles do not credit the Report's *revelation* of IonQ's fraud as contributing to the decline in share price so much as they credit the *allegation* of fraud as a contributing factor. The Shareholders' new allegations do no more than suggest a possible correlation between the Report's publication and IonQ's stock price decline. As the district court noted, correlation does not equal causation. *See Ion Q II*, 2024 WL 3360647, at *12.

For all those reasons, the additional factual contentions put forward in the proposed second amended complaint do not support that the Report is a plausible source for exposing

any purported truth of IonQ's alleged fraud. Therefore, we find no error in the district court's conclusions.

2.

If the Report did not show the market IonQ's false representations by itself, the Shareholders claim the way IonQ reacted to it did. The Shareholders allege that IonQ's "anodyne" May 4 press release was a corrective disclosure. J.A. 1056. We again disagree.

The Shareholders' theory is that the IonQ press release, when viewed in tandem with the Report, together expose some truth to the market for purposes of pleading loss causation. In *Katyle*, we recognized that "disclosures need not precisely identify the misrepresentation or omission" and "can emanate from any . . . source" so long as they "reveal to the market in some sense the fraudulent nature of the practices about which a plaintiff complains." 637 F.3d at 473. In theory, we can envision a scenario where a third party exposes some unverified bombshell about a company and the company's tacit *mea culpa* could function as a verification of that bombshell. But that theory holds no water here.

The Shareholders allege that the May 4 press release "did not dispute—or even address—any of the claims in the Scorpion Report . . . . Instead, [it] merely quoted IonQ's chairman of the board as stating that, 'I have the utmost confidence in the IonQ team and their integrity, commitment to ongoing research and patented inventions and accomplishments that benefit IonQ's customers and partners.'" J.A. 1056–57. They ask us to infer from its characterization of the press release that the company conceded that the Report was accurate insofar as it revealed IonQ's fraud to the market.

19

Reading beyond the excerpt cited, IonQ's May 4 press release—which we may consider in its totality because it is essential to the Shareholders' complaint, *see Phillips*, 190 F.3d at 618—reveals that the Shareholders' characterization is inaccurate at best. In reality, IonQ derided the Report because it "contain[ed] important inaccuracies and mischaracterizations regarding IonQ's business and progress to date," while noting the "report's author . . . stands to profit in the event that the stock price of IonQ declines." J.A. 690. That's why IonQ "caution[ed] investors to not make decisions based on this report." *Id.* The press release cannot reasonably be read to—tacitly or otherwise—"relate back" to the Report's claims such as to "reveal to the market in some sense the fraudulent nature of" IonQ's business, as allegedly uncovered by the Report. *Singer*, 883 F.3d at 446 (quoting *Katyle*, 637 F.3d at 473).[3,4]

**** 

In sum, we hold the Shareholders did not plausibly allege that either the Report or IonQ's May 4 press release "revealed 'new facts' suggesting [IonQ] had perpetrated a fraud on the market." *Katyle*, 637 F.3d at 473 (quoting *Teachers' Ret. Sys.*, 477 F.3d at 187).

---

[3] The Shareholders do not advance IonQ's May 12 article as a corrective disclosure. Even if they did, however, the same reasoning above would apply with even more force because that article contains a stauncher rebuke of the Report. *See* J.A. 692–94.

[4] Beyond that, as the district court and IonQ pointed out, the Shareholders cite no authority suggesting that a firm must issue a point-by-point rebuttal to a public allegation of fraud instead of a blanket denial of the Report's accuracy to show it is not acknowledging its truth. Such a rule would impose an impossible standard on companies that likely have more important things to do than address every single public and anonymous allegation.

IV.

We are not experts in quantum computing, but we do know that a plaintiff fails to plead loss causation when it fails to plausibly allege truth leaked out to the market. We therefore agree that the Shareholders' proposed second amended complaint fails to state a claim and allowing amendment would thus be futile. The judgment of the district court is

*AFFIRMED.*